```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------x
ROBERT J. LEVY, derivatively on
behalf of SUFFOLK BANCORP.,

                Plaintiff,          MEMORANDUM & ORDER
                                    11-CV-3321(JS)(GRB)
    -against-

J. GORDON HUSZAGH, STACEY L.
MORAN, TERENCE X. MEYER,
THOMAS S. KOHLMANN, EDGAR F.
GOODALE, JOSEPH A. GAVIOLA,
JOHN D. STARK Jr., SUSAN V.B.
O'SHEA, JAMES E. DANOWSKI,
and DAVID A. KANDELL,

                Defendants,

    -and-

SUFFOLK BANCORP., a New York
Corporation,

                Nominal Defendant.

----------------------------------x
```

APPEARANCES
For Plaintiff:      Brian J. Robbins, Esq.
                    Felipe Arroyo, Esq.
                    Shane Sanders, Esq.
                    Robbins Umeda LLP
                    600 B Street, Suite 1900
                    San Diego, CA 92101

                    Thomas G. Amon, Esq.
                    Law Offices of Thomas G. Amon
                    250 West 57th Street, Suite 1316
                    New York, NY 10107

For Defendants:     George T. Conway, III, Esq,
                    Wachtell, Lipton, Rosen & Katz
                    51 West 52nd Street
                    New York, NY 10019

SEYBERT, District Judge:

Plaintiff Robert J. Levy filed this shareholder derivative action against certain officers and directors of Suffolk Bancorp ("Suffolk") alleging certain improprieties in how Suffolk calculated and stated allowances for loan losses. Pending before the Court is Defendants' motion to dismiss for Plaintiff's failure to make a proper demand on Suffolk's board of directors. For the following reasons, this motion is GRANTED.

BACKGROUND

Suffolk is a bank holding company whose principal subsidiary is Suffolk County National Bank (the "Bank"), a full-service banking operation on Long Island, New York. At all relevant times, Plaintiff was a Suffolk shareholder. (Compl. ¶¶ 12-13.)

Defendants were directors and/or officers of Suffolk during the relevant period. (Id. ¶¶ 14-23.) As is pertinent here, J. Gordon Huszagh is the president and chief executive of both Suffolk and the Bank. Terence Meyer is a director of Suffolk and the Bank, and he is also a partner in the law firm Meyer, Meyer & Keneally, which receives significant business from the Bank. (Id. ¶ 15.) Four defendants, including Meyer, are alleged to have made suspiciously-timed trades of Suffolk stock. (See id. ¶¶ 14-23.)

2

Plaintiff asserts that Defendants breached their duties of loyalty and good faith by allowing or causing Suffolk to issue improper statements about the Bank's allowance for loan losses. (E.g., id. ¶ 34.) Under applicable accounting rules, Suffolk was required to take allowances for probable losses on its loans. The allowance is calculated based on management's estimate of the total amount of risk in a bank's loan portfolio. (Id. ¶ 42.) The figure should account for "impaired" loans, which are loans "for which it is probable that the lender will not collect all amounts due under the contractual terms of the loan." (Id.) Based on the allegations detailed below, Plaintiff asserts that Suffolk understated its loan loss allowance and failed to disclose significant risks of loan losses in its financial statements. (Id. ¶ 44.)

I. Alleged Improper Calculations and Statements

On March 12, 2010, Suffolk issued its Form 10-K for fiscal year 2009. This document reported that Suffolk's loan loss allowance was $9,051,000 as of January 2009 and $12,333,000 as of December 31, 2009. According to the Form 10-K, Suffolk believed that this loan allowance figure was high enough to absorb the Bank's estimated credit losses. (Id. ¶ 45.)

On April 13, 2010, Suffolk released its earnings for the first quarter of 2010. The release stated that net income was down but that, "[i]n many respects, our balance sheet is

stronger than it was at this time last year." (Id. ¶ 46.) The release stated that Suffolk's allowance for loan losses was $14,994,000. This figure represented a 49.6 percent increase over the same quarter from the previous year. (Id.)

On April 26, 2010, Suffolk issued a corrected earnings release for the first quarter of 2010. (Id. ¶ 47.) The release stated that Suffolk had increased its loan loss allowance from $14,994,000 to $21,132,000. (Id.) Notwithstanding this significant correction, Plaintiff maintains that Suffolk was still not calculating its loss allowance appropriately. (Id.)

On May 10, 2010, Suffolk filed its Form 10-Q for the first quarter of 2010. The filing reiterated that Suffolk's allowance for loan losses was $21,132,000, and it further stated that "there has been no significant change in Suffolk's internal controls over financial reporting that occurred during Suffolk's most recent fiscal quarter that has materially affected, or is reasonably likely to materially effect [sic], Suffolk's internal controls over financial reporting." (Id. ¶ 48.)

On July 15, 2010, Suffolk issued its earnings release for the second quarter of 2010. The release stated that Suffolk's earnings were down and its loan loss allowance was $20,866,000, a more than ninety percent increase over the second quarter of 2009. (Id. ¶ 49.) Similar to Suffolk's past statements, the release mentioned that the loan allowance

4

"adequately provides for the risks we now face in our loan portfolio." (Id.)

On August 4, 2010, Suffolk filed its Form 10-Q for the second quarter of 2010. The filing contained Suffolk's second quarter earnings and loss allowance figures, and it stated that there had been no significant changes in Suffolk's internal controls over its financial reporting. (Id. ¶ 50.)

On October 15, 2010, Suffolk issued its earnings release for the third quarter of 2010. Earnings were down again, and the loan loss allowance had been increased to $21,964,000. (Id. ¶ 51.) In the release, Defendant Huszagh noted that the Bank's non-performing loans were 3.2 percent of its portfolio, a figure that "compare[s] favorably to the average of our peer group which is 3.51 percent of total loans." (Id.)

## II. The OCC Agreement

On October 25, 2010, Suffolk entered into an agreement with the Office of the Comptroller of the Currency (the "OCC"). This agreement (the "OCC Agreement") required Suffolk and its board to, among other things, create a compliance committee, establish a three-year strategic plan and capital program, and establish programs related to Bank functions such as its internal audit procedures, it loan-loss reserves, and its credit risk management. (Id. ¶ 28.) As to loan losses, the OCC

Agreement provided that Suffolk's board would require the Bank to develop a written program for maintaining an adequate loan loss cushion. (See Defs. Ex. F, OCC Agreement at 12-14.) In developing and implementing this plan, the Bank was to, among other things, review and revise its methodology for evaluating historical loss rates, stratify loan types "to more accurately assess risk," and document its evaluations and appraisals of impaired loans. (Id.)

III. Post-OCC Agreement Statements

On November 9, 2010--less than three weeks after it entered into the OCC Agreement--Suffolk filed its Form 10-Q for the third quarter of 2010. The filing contained Suffolk's third quarter earnings and loan allowance figures, and like previous filings, it stated that there had been no significant changes in Suffolk's internal controls over its financial reporting. (Compl. ¶ 52.)

On January 18, 2011, Suffolk issued its earnings results for the fourth quarter of 2010 and for the 2010 fiscal year. The Audit Committee reviewed and approved the release, which stated that Suffolk's loan loss allowance was $21,288,000. This release also mentioned the OCC Agreement. (Id. ¶ 53.)

On March 15, 2011, Suffolk filed its Form 10-K for fiscal year 2010. The filing stated that Suffolk had re-assessed its internal controls over its financial reporting as

of December 31, 2010 and concluded that its reporting was effective. (Id. ¶ 56.) Suffolk's annual report, issued the same day, addressed the OCC Agreement in its discussion of loan losses: "As required by the Agreement with the OCC, Suffolk is in the process of reviewing its allowance for loan[] losses, which may result in an increased provision to the allowance." (Defs. Ex. G, the OCC Agreement at 17.)

On May 11, 2011, Suffolk issued a press release in advance of its earnings for the first quarter of 2011. (Compl. ¶ 58.) The release explained that while preparing its earnings statement for the first quarter, management identified "possible deficiencies and/or weaknesses" in Suffolk's internal controls, including "as with regard to risk rating which affected the computation of the allowance for loan losses." (Id.) The release warned that Suffolk might have to restate its loan loss allowance and/or its financial statements for prior periods. (Id.) The release further advised that Suffolk's expected reported income would be a $12,899,000 loss. On the same day, Suffolk filed a Form NT 10-Q, which alerted the SEC that Suffolk would not be filing a timely Form 10-Q for the first quarter of 2011.[1] (Id. ¶ 59.)

---

[1] Suffolk's failure to file a timely Form 10-Q eventually led to a warning from NASDAQ that Suffolk could be de-listed. (Compl. ¶ 60.)

7

IV. Plaintiff's Futility Allegations

Plaintiff alleges that a pre-suit demand on Suffolk's board is excused under the futility doctrine. Specifically, he alleges that (1) the entire board was responsible for concealing Suffok's need for a larger loan loss allowance and that the Defendants face liability for their actions (id. ¶¶ 84-86); and (2) that certain Defendants made suspiciously-timed trades designed to profit from their inside knowledge of the true loan loss allowance picture (id. ¶ 87). On the former point, Plaintiff's theory that Defendants deliberately understated the allowance hinges mainly on his allegations that the Bank's bad loans were piling up at the same time that Suffolk was making allowance calculations that later seemed inadequate. In 2009, charge-offs from bad loans totaled $1,210,000. The following year, they had grown to $8,228,000, a 580 percent increase. (Id. ¶ 64.) Similarly, in the two years between 2008 and 2010, the number of the Bank's non-performing loans rose form .45 percent of its total portfolio to 3.14 percent, a 587 percent increase. (Id.) Yet, over the same two-year period, Suffolk's loan loss allowance increased just 135 percent, from $9,0510,000 to $21,288,000. (Id.)

## DISCUSSION

Defendants argue that this case must be dismissed because Plaintiff has not established that a pre-suit demand

8

would have been futile.  Federal Rule of Civil Procedure 23.1 requires plaintiffs to plead futility with particularity.  The law of the state of Suffolk's incorporation--New York--governs the substantive futility analysis.  See, e.g., Kautz v. Sugarman, 456 F. App'x 16, 19 (2d Cir. 2011).

Because derivative actions inherently interfere with the managerial discretion of corporate boards, New York courts have "historically been reluctant to permit shareholder derivative suits, noting that the power of courts to direct the management of a corporation's affairs should be 'exercised with restraint.'"  Marx v. Akers, 88 N.Y.2d 189, 194, 666 N.E.2d 1034 (1996) (quoting Gordon v. Elliman, 306 N.Y. 456, 462, 119 N.E.2d 331 (1954)).  Under New York law, demand is considered futile in three situations.  First, "when a complaint alleges with particularity that a majority of the board of directors is interested in the challenged transaction."  Marx, 666 N.E.2d at 1040-41.  "Director interest may either be self-interest in the transaction at issue or a loss of independence because a director with no direct interest in a transaction is 'controlled' by a self-interested director."  Id. at 1041 (citation omitted).  Second, "when a complaint alleges with particularity that the board of directors did not fully inform themselves about the challenged transaction to the extent reasonably appropriate under the circumstances."  Id.  The

9

"long-standing rule" is that a director "does not exempt himself from liability by failing to do more than passively rubber-stamp the decisions of active managers."  Id. (quoting Barr v. Wackman, 36 N.Y.2d 371, 381, 368 N.Y.S.2d 497, 329 N.E.2d 180 (1975)).  Third, "when a complaint alleges with particularity that the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment of the directors." Id.  "The Court of Appeals emphasized that pre-suit demand is the rule, that excusing demand is the exception, and that the exception should not be permitted to swallow the rule."  In re Omnicom Group Inc. Shareholder Deriv. Litig., 43 A.D.3d 766, 768, 842 N.Y.S.2d 408, 410 (1st Dep't 2007) (citing Marx, 666 N.E.2d at 1040).

This case concerns New York's third exception to the demand requirement--that the challenged conduct was so egregious that it could not possibly have been the product of sound business judgment.[2]  Plaintiff's position is that the Defendants disregarded their duties by (1) deliberately and materially understating Suffolk's loan loss allowance and (2) making misleading statements.  (Pl. Opp. 9.)  Neither excuses his failure to make a pre-suit demand.

---

[2] Inasmuch as Plaintiff contends that Defendants deliberately understated Suffolk's loan loss reserves (see Pl. Opp. 17), the second exception, which concerns directors' failure to inform themselves about a particular course of action, is inapplicable here.

On the first point, Plaintiff relies on insufficient allegations of "knowing" misconduct (see Pl. Opp. 19) and distinguishable caselaw in an attempt to show that Defendants' actions were "egregious." He cites Defendants' general knowledge of the national recession and their particular knowledge of the Bank's souring loan portfolio to urge the inference that Suffolk's allowance calculations were deliberately understated. (See Pl. Opp. 10.) With the aid of hindsight, the allowance figures may seem overly optimistic given the economic turbulence of our time. But as even Plaintiff concedes (Pl. Opp. 10), the proper level of loss reserves is a managerial judgment call. See Fait v. Regions Fin. Corp., 655 F.3d 105, 113 (2d Cir. 2011) ("[D]etermining the adequacy of loan loss reserves is not a matter of objective fact. Instead, loan loss reserves reflect management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible." (citations omitted)). And the Complaint here does not plausibly suggest that Defendants' conduct crossed the line from making good faith but misguided calculations to knowingly improper conduct. See, e.g., Auerbach v. Bennett, 47 N.Y.2d 619, 629, 393 N.E.2d 994, 1000 (1979) (business judgment rule protects directors even where the "results show that what they did was unwise or

inexpedient" (quoting Pollitz v. Wabash R.R. Co., 207 N.Y. 113, 124, 100 N.E. 721, 724 (1912)).

Plaintiff relies heavily on an options back-dating case, In re Comverse, 56 A.D.3d 49, 866 N.Y.S.2d 10 (1st Dep't 2008), but the Court agrees with Defendants that rather than support his cause, Comverse highlights the shortcomings in Plaintiff's case. In that action, the complaint alleged that the compensation committee "unquestioningly" approved option grants more than a month after the grant date "in circumstances where the stock price had risen dramatically in the intervening period." 866 N.Y.2d at 16. In finding that demand was futile under the third prong of the Marx test, the court explained: "the approval of a decade's worth of backdated stock options simply does not qualify as a legitimate exercise of business judgment." Id. at 17. Thus, unlike Plaintiff, the plaintiffs in Comverse alleged with specificity conduct that was "open and egregious." See Wandel v. Eisenberg, 60 A.D.3d 77, 82, 871 N.Y.S.2d 102, 2009 N.Y. Slip Op. 00115, 4 (1st Dep't 2009) (distinguishing Comverse as alleging with particularity a "purposeful and egregious backdating scheme where the directors had significant reason to question or investigate the process of stock option issuance and failed to do so" and "failed to take action to correct the damage . . . even after the scheme came to light").

Plaintiff's second argument is that Defendants made misleading statements in their earnings releases and SEC filings and that these statements themselves constituted breaches of Defendants' fiduciary duties. This theory is unpersuasive largely for reasons already discussed. Although the loan-loss allowances eventually proved to be inadequate, Plaintiff has not plausibly alleged that Defendants thought at the time that their calculations were flawed. The same is true for Defendants' statements that Suffolk's internal controls were adequate; there is no plausible allegation that Defendants knew at the time and concealed facts about the inadequacy of Suffolk's internal controls. The OCC Agreement is not evidence to the contrary; as Defendants point out, the OCC identified issues that Suffolk needed to address but did not attribute the shortcomings to bad faith or dishonesty. (See generally Defs. Ex. F, OCC Agreement (finding "unsafe and unsound banking practices" but entrusting Suffolk's board with taking remedial actions).) Further, Suffolk disclosed the OCC's concerns and the steps it was taking to address regulators' concerns. (See generally Defs. Exs. F, G.)

In sum, Plaintiff's allegations do not show with specificity why Defendants' alleged actions were so egregious as to preclude the possibility that they were undertaken pursuant to a valid exercise of Defendants' business judgment. Wandel,

871 N.Y.S.2d at 106; In re Omnicom, 842 N.Y.S.2d at 411 ("Therefore, the defendants correctly contend the facts, as pleaded in the complaint, do not rule out all possibility that the transaction was the product of sound business judgment.").[3]

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Docket Entry 9) is GRANTED. Plaintiff may file an Amended Complaint within thirty (30) days from the date of this Memorandum and Order.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated: September  28 , 2012
       Central Islip, New York

---

[3] Plaintiff's insider trading allegations would not satisfy the futility doctrine because, even assuming that they are plausible, they implicate only a minority of the directors. See Wandel, 871 N.Y.S.2d at 104. Moreover, Defendants have cast serious doubt on the plausibility of these allegations, including by showing that Defendant Huszagh, for example, actually increased his stake in Suffolk during the relevant time period. (See Defs. Ex. M.)